Cindy A. Cohn, Esq. (SBN 145997)
Wendy Seltzer, Esq.
ELECTRONIC FRONTIER FOUNDATION
454 Shotwell Street
San Francisco, CA 94110
Telephone: (415) 436-9333 x108
Facsimile: (415) 436-9993

Alan Korn, Esq. (SBN 167933)
LAW OFFICE OF ALAN KORN
1840 Woolsey Street
Berkeley, CA 94703
Telephone: (510) 548-7300
Facsimile: (510) 540-4821

Attorneys for Plaintiff
ONLINE POLICY GROUP

Jennifer Stisa Granick, Esq. (SBN 168423)
STANFORD LAW SCHOOL
CYBERLAW CLINIC
559 Nathan Abbott Way
Stanford, CA 94305-8610
Telephone: (650) 724-0014
Facsimile: (650) 723-4426

Attorneys for Plaintiffs
NELSON CHU PAVLOSKY and LUKE
THOMAS SMITH

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ONLINE POLICY GROUP, NELSON CHU PAVLOSKY, and LUKE THOMAS SMITH, <br><br> Plaintiffs, <br><br> v. <br><br> DIEBOLD, INCORPORATED, and DIEBOLD ELECTION SYSTEMS, INCORPORATED, <br><br> Defendants. | No. C-03-04913 JF <br><br> **FIRST AMENDED COMPLAINT FOR INJUNCTIVE RELIEF FOR INTENTIONAL INTERFERENCE WITH CONTRACT; FOR COPYRIGHT MISUSE; FOR DAMAGES FOR MISREPRESENTATION OF COPYRIGHT CLAIMS UNDER THE DIGITAL MILLENNIUM COPYRIGHT ACT; AND FOR DECLARATORY RELIEF** <br><br> (Jury Trial Demanded) |

1.  This is a civil action seeking injunctive relief for intentional interference with contract; for copyright misuse; for damages for misrepresentation of copyright claims under the

1    Digital Millennium Copyright Act; and for declaratory relief.

2    2.    This case arises out of legal threats issued by the Defendants, namely threats of
3    copyright litigation made in an attempt to stifle public discussion and criticism of the Defendant
4    companies' products, electronic voting machines. The threats have successfully induced the
5    removal of the information from the websites run by Plaintiffs Pavlosky and Smith, due to actions
6    taken by their ISP, Swarthmore College. The threats have also interfered with the contractual
7    relationship between Plaintiff Online Policy Group and its upstream Internet service provider,
8    Hurricane Electric and that between Plaintiffs Pavlosky and Smith and Swarthmore College.

## PARTIES

10   3.    Plaintiff Online Policy Group ("OPG") is a California public benefit corporation
11   with its principal place of business in the State of California, county of San Francisco.

12   4.    Nelson Chu Pavlosky ("Pavlosky") is an individual residing at 500 College Avenue
13   at Swarthmore College, Swarthmore, Pennsylvania. Pavlosky is a sophomore at Swarthmore
14   College and one of the co-founders of the Swarthmore Coalition for the Digital Commons
15   ("SCDC").

16   5.    Luke Thomas Smith ("Smith") is an individual residing at 500 College Avenue at
17   Swarthmore College, Swarthmore, Pennsylvania. Smith is a sophomore at Swarthmore College
18   and the other co-founder of the SCDC.

19   6.    On information and belief, Diebold, Inc. is an Ohio corporation with its principal
20   place of business in the State of Ohio. On information and belief, Defendant Diebold Election
21   Systems, Inc. is a wholly owned subsidiary of Diebold, Inc. Both Defendants will be collectively
22   referred to as "Diebold."

23   7.    On information and belief, Diebold manufactures and sells electronic voting
24   systems and software, including voting systems used in Alameda, Fresno, Humboldt, Lassen,
25   Marin, Modoc, Placer, San Luis Obispo, Santa Barbara, Siskiyou, Trinity, and Tulare counties in
26   California. Diebold systems have also been sold for use in Georgia, Maryland, Massachusetts,
27   Ohio, and Texas.

**JURISDICTION AND VENUE**

8. This court has subject matter jurisdiction over the federal claims pursuant to the Copyright Act (17 U.S.C. §§ 101 et seq.), 28 U.S.C. §§ 1331 and 1338 and the Declaratory Judgment Act (28 U.S.C. § 2201). This court has supplemental subject matter jurisdiction over state law claims pursuant to 28 U.S.C. § 1367(a) in that the state law claims form part of the same case or controversy as the federal claims.

9. Plaintiffs are informed, believe and thereon allege that Defendants, and each of them, have sufficient contacts with this district generally and, in particular, with the events herein alleged, that each such Defendant is subject to the exercise of jurisdiction of this court over the person of such defendant and that venue is proper in this judicial district pursuant to 28 U.S.C. § 1391.

10. Plaintiffs are informed, believe and thereon allege that, based on the places of businesses of the Defendants identified above and/or on the national reach of Defendants, and each of them, a substantial part of the events giving rise to the claims herein alleged occurred in this district and that Defendants, and each of them, and/or an agent of each such Defendant, may be found in this district.

**FACTUAL ALLEGATIONS RELATED TO ALL COUNTS**

ONLINE POLICY GROUP

11. OPG is a San Francisco-based volunteer organization providing pro bono Internet hosting services and colocation services to nonprofit organizations and individuals who are under-represented, underserved, or facing unfair bias, discrimination, or defamation. Founded in July 2000, OPG now serves approximately 1000 websites; it provides collocation facilities to more than 100 users who themselves host more than 110 websites. Overall, OPG serves more than 77,700 individuals.

12. OPG's users include San Francisco IndyMedia, a branch of the international Independent Media Center news media collective. San Francisco IndyMedia hosts a website available at both <http://www.indybay.org> and <http://www.sf.indymedia.org>. The San Francisco IndyMedia website resides on a webserver co-located with OPG. "Colocation" means

that the San Francisco IndyMedia server is not owned or controlled by OPG; it simply resides in physical premises leased from OPG alongside OPG's own servers and utilizes OPG's Internet connection.

13. OPG receives its "upstream" Internet connection from Hurricane Electric, an upstream ISP (also known as a Business Technical Service Provider) based in Fremont, California. Attached hereto as Exhibit A is a true and correct copy of the written contract between OPG and Hurricane Electric.

14. On October 10, 2003, Diebold sent OPG a cease-and-desist letter under 17 U.S.C. § 512 through its attorney, Ralph E. Jocke, threatening copyright infringement litigation if OPG failed to remove links and other information from the IndyMedia website. A true and correct copy of the cease-and-desist letter is attached as Exhibit B hereto and incorporated herein by reference.

15. The October 10, 2003 letter asserts that an IndyMedia web page hosted by OPG links to online locations at which Diebold correspondence was posted, specifically excerpts from an e-mail archive of communications among Diebold employees about the company's electronic voting machine product (the archive in its entirety shall be referred to herein as the "e-mail archive"). The letter asserts that Diebold holds copyright to the correspondence, and further asserts that the IndyMedia webpages that link to the locations where the e-mail archive is "infringe[s] Diebold's copyrights."

16. Further, the October 10, 2003, letter purports to "advise [OPG] of our clients' rights and to seek [OPG's] agreement to the following: To disable or remove the information location tool(s) identified in the attached chart. In addition to disabling or removing any hyperlink, the disabling or removal should include destroying the usefulness as an information location tool of any textual directory or pointer information contained therein."

17. The October 10, 2003 letter expressly asserts that Diebold "reserve[s] their position insofar as costs and damages caused by" OPG's hosting of the IndyMedia website with links to the portion of the e-mail archive and further asserts that it "reserve[s] their right to seek injunctive relief to prevent further" hosting of the IndyMedia website with links to the e-mail archive by OPG. In other words, the letter included a threat of litigation against OPG if it did not comply with

the demands in the letter.

18. The October 10, 2003 letter states that Diebold "looks forward to a response within 24 hours."

19. The October 10, 2003 letter to OPG caused great apprehension, concern and disruption to OPG. OPG sent a brief response indicating that it was consulting with counsel.

20. Because OPG does not control the San Francisco IndyMedia computer hosting the website, instead only providing Internet connectivity to that computer through colocation, OPG could not comply by merely disabling or removing the hyperlink and related information demanded by Diebold. OPG's only option to comply with the demand was to cut off IndyMedia's Internet connectivity entirely. This would disable the entire website and any other information stored on that computer from connection to the Internet.

21. While fearful of the potential of ruinous litigation, OPG board decided not to comply, because the demand would require OPG to restrict speech by its users that OPG believed was lawful, in ways antithetical to the OPG mission of promoting free speech.

22. On October 22, 2003, OPG's counsel wrote a response to Diebold's counsel stating that OPG would not comply with the demand and explaining why it had come to that decision. Attached hereto as Exhibit "C" is a true and correct copy of the letter sent by OPG counsel to Diebold counsel.

23. At about the same time, another user of OPG's web hosting services indicated that it wished to publish the e-mail archive.

24. Also on October 22, 2003, OPG received notice that its upstream Internet provider, Hurricane Electric, had received a cease-and-desist letter from Diebold. Attached hereto as Exhibit "D" is a true and correct copy of the letter sent by Diebold Counsel to Hurricane Electric.

25. Diebold's October 21, 2003, cease-and-desist letter to Hurricane Electric, which Hurricane forwarded to OPG, demanded that Hurricane Electric "assist in removing the identified infringing material or act in accordance with your 17 U.S.C. 512(i)(1)(A) policy that 'provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's network who are repeat infringers.'"

26. Again, Diebold's actions caused tremendous apprehension, concern and disruption to OPG. This time, however, the threat carried much more severe consequences. As with the technical structure between OPG and IndyMedia, the technical structure between Hurricane and OPG meant that Hurricane Electric could not simply remove the link from the IndyMedia website hosted by OPG. Instead, Diebold's demands, if complied with by Hurricane Electric, would result in the disconnection of all of OPG's users from the Internet and the disabling of all of the approximately 1000 websites and other Internet services provided by OPG to the more than 77,700 individuals served by OPG. Such disconnection by Hurricane Electric in response to Diebold's demand would threaten the continued existence of OPG. The volunteer board held an emergency board meeting to discuss the Diebold letter to Hurricane Electric.

27. In a discussion with OPG on October 22, Hurricane Electric informed OPG that it took Diebold's copyright demands seriously.

28. After OPG indicated that it intended to seek relief from this Court against further threats from Diebold, Hurricane Electric informed OPG that it would not take action to terminate OPG's contract based on this single complaint regarding IndyMedia's links.

29. However, Hurricane Electric has stated that it might be forced to terminate OPG's contract in the future, if it received further demands from Diebold.

30. In particular, Hurricane Electric has stated that it might be forced to terminate OPG if it received complaints alleging that OPG's clients were hosting Diebold material directly, rather than just linking to it.

31. Based upon the conversation with Hurricane Electric, OPG told other users that they may not host the e-mail archive pending clarification from this Court.

### MR. PAVLOSKY AND MR. SMITH

32. Plaintiffs Pavlosky and Smith co-founded SCDC, an unincorporated student association, in September of 2003 to advocate a bottom-up participatory structure for society and culture, characterized by the free and open exchange of information. The group is dedicated to the promotion of free and open-source technological standards to enable such participation.

33. SCDC operates an Internet website on the Swarthmore College network at

1  <http://scdc.sccs.swarthmore.edu>. Internet connectivity and the right to set up websites for
2  student organization use are among the services provided as part of Swarthmore College tuition.

3  34. The SCDC website describes the organization's goals and mission, alerts members
4  and interested students of meetings, and provides updates on organizational activities and projects.
5  The website also provides links to resources, including newspaper articles and other websites,
6  relevant to SCDC's goals and mission.

7  35. SCDC members discussed the effect of technology on government, and particularly
8  the issue of voting transparency, as early as their first meeting in September 2003. Plaintiff
9  Pavlosky considered studying non-proprietary, open-source alternatives to voting technologies
10 developed by private companies with proprietary interests.

11 36. Plaintiffs Pavlosky and Smith first heard about the Diebold email archive from
12 friends active in another Swarthmore student group, Why-War? The www.Why-War.com website
13 hosted the e-mail archive between October 8 and 10, 2003. After hearing that the e-mail archive
14 contained information on, among other topics, the (lack of) accuracy, security and accountability of
15 Diebold's electronic voting machines widely used in the United States, Plaintiffs Pavlosky and
16 Smith viewed and downloaded the archive.

17 37. Plaintiffs Pavlosky and Smith determined that the e-mail archive was directly
18 relevant to the SCDC's study project.

19 38. Plaintiffs Pavlosky and Smith learned at some time in early October that Diebold
20 had asked Why-War?'s off-campus Internet service provider to disable access to the e-mail
21 archive, at which point student members of Why-War? and other Swarthmore students began to
22 host the archive on personal websites. This arrangement was impracticable due to the size of the
23 archive and bandwidth issues.

24 39. Thereafter, Plaintiffs Pavlosky and Smith decided to post the e-mail archive on the
25 SCDC website to preserve public access to the documents. On October 21, 2003, SCDC posted the
26 e-mail archive in downloadable .tar and searchable HTML formats on its website to show the
27 public the serious and deep-seated problems with the Diebold machines, and to educate the public
28 about the need for a transparent voting system. A subset of the posted e-mail archive is attached

hereto as Exhibit "E".

40. On October 22, 2003, Swarthmore College administration told SCDC that the school had received a letter from Diebold claiming that someone on the Swarthmore network was infringing Diebold's copyright by posting portions of the e-mail archive. A true and correct copy of the cease-and-desist letter, which Plaintiff Pavlosky later obtained, is attached hereto as Exhibit "F".

41. On October 23, 2003, Swarthmore disabled Internet access to the e-mail archive on the SCDC website.

42. Plaintiff Smith subsequently added a link from the SCDC website to the e-mail archive posted on a remote site. Plaintiff Pavlosky removed this link after being informed that even linking from a Swarthmore website to an outside website hosting the e-mail archive contravened Swarthmore policy.

43. Neither Plaintiff Pavlosky nor Plaintiff Smith is currently hosting or linking to the e-mail archives on the SCDC website or any other site.

44. Plaintiffs Pavlosky and Smith are concerned for their ability to learn more about the e-voting debate, including their ability to plan a symposium, "Choosing Clarity: Symposium on Voting Transparency," that SCDC had set for the week of December 1, 2003.

THE PUBLIC DEBATE ABOUT THE SECURITY OF ELECTRONIC VOTING MACHINES

45. The security and independent verifiability of the accuracy of electronic voting systems, including those manufactured by Diebold, are subjects of intense national debate. Diebold electronic voting machines have been criticized for overall lax security, both in the machines themselves and in the processes used by Diebold to test, update and develop the product. Plaintiffs are informed and believe, and based upon such information and belief allege that as a result of independent research done on certain Diebold computer code that revealed serious security problems, the State of Maryland commissioned a study of the Diebold code that confirmed "high-risk vulnerabilities in the implementation of the managerial, operational and technical controls for" Diebold's electronic voting system.

46. Moreover, some members of the public have raised concerns because the Diebold e-

1  voting machines, like many others, produce no paper records of votes cast that can be reviewed and
2  verified by individual voters for accuracy and then used as a separate audit trail in the case of a
3  question about the accuracy of the machines or other circumstances. Members of the public and
4  some election officials have raised concern that such systems, including Diebold's system, by
5  relying entirely on the security of the voting systems themselves for verification of election results,
6  create a tremendous risk of erroneous or fraudulent election results.

7  47.  These concerns, among others, have resulted in significant public debate and media
8  coverage about the security of Diebold's voting machines.

9  48.  Numerous Internet websites have posted news, reports, and internal Diebold
10 documents assessing the security of Diebold electronic voting systems, including the e-mail
11 archive.

12 49.  Numerous traditional print, radio and television media have reported on the
13 controversy surrounding electronic voting machine security, including the security of Diebold's
14 electronic voting machines.

15 50.  Numerous websites have linked to the Diebold e-mail archive as source material for
16 their commentary and criticism.

17 51.  A Diebold spokesperson says the company has been issuing cease-and-desist
18 demands to everyone who has posted Diebold documents, asserting copyright in the documents.
19 Attached hereto as Exhibit "G" is a true and correct copy of a Delaware County Times article,
20 dated Friday Oct. 24, 2003, quoting Mike Jacobsen.

21 52.  Many ISPs have taken down websites in response to Diebold's litigation threats.

22 53.  Plaintiffs are informed and believe and based upon such information and belief
23 allege that Diebold will continue to send out these cease-and-desist letters unless restrained by this
24 court.

25 **COUNT I: TORTIOUS INTERFERENCE WITH CONTRACT**
   (All Parties)
26

27 54.  Plaintiffs repeat and incorporate herein by reference the allegations in the preceding
28 paragraphs of this complaint.

Case 5:03-cv-04913-JF   Document 30   Filed 11/14/03   Page 10 of 16

### Online Policy Group

55. OPG contracts with Hurricane Electric for Internet connectivity. Exhibit A.

56. Defendants' cease-and-desist letter of October 21, 2003, admits knowledge of the contractual relationship between OPG and Hurricane Electric, specifically referring to OPG as one of Hurricane Electric's "subscribers and account holders." Exhibit D.

57. Defendants' October 21, 2003, cease-and-desist letter to Hurricane Electric was designed to cause Hurricane Electric to terminate, interrupt, or otherwise limit OPG's Internet service by misrepresenting that the actions of OPG in hosting IndyMedia's website with links to the e-mail archive violated Diebold's copyrights.

58. Diebold's threat did disrupt OPG's relations with Hurricane Electric, causing Hurricane to make immediate demands to OPG, and to threaten interruption of OPG's Internet service in the future if Diebold documents or links are hosted on machines OPG co-locates with Hurricane. Because of the threats from Diebold, OPG has been made to fear for the continuity of its Internet service from Hurricane.

59. As a result of these disruptions, and in order to assure that it is not disconnected from the Internet, OPG may be forced to take down the links to the e-mail archive, and with them IndyMedia's entire website, if it receives a further threat from Diebold.

60. As a result of these disruptions, and in order to assure that it is not disconnected from the Internet, OPG has been forced to limit its clients' activities in ways that are contrary to the OPG mission to support free speech, specifically by refusing to allow its users to host the e-mail archive.

### Pavlosky and Smith

61. Pavlosky and Smith obtain Internet connectivity and the ability to operate the SCDC website on the Swarthmore network through Swarthmore College. They pay for that connectivity as part of their student fees.

62. Defendants' letter of October 9, 2003, to Swarthmore College admits knowledge of the contractual relationship between Pavlosky and Smith and Swarthmore. Exhibit F.

63. Defendants' cease-and-desist letter to Swarthmore was designed to cause

Swarthmore to terminate, interrupt, or otherwise limit the Internet service provided by Swarthmore to Pavlosky and Smith – service to which they were contractually entitled – by misrepresenting that the actions of students in publishing the e-mail archive violated Diebold's copyrights.

64. Diebold's threat did disrupt Pavlosky and Smith's relations with Swarthmore, causing Swarthmore to make immediate demands to Pavlosky and Smith that they cease posting and linking to the e-mail archive and to threaten interruption of Pavlosky and Smith's Internet service in the future, if Diebold documents or links to such documents are hosted on machines that SCDC or Pavlosky or Smith individually connects to the Swarthmore College network. Because of the threats from Diebold, Pavlosky and Smith have been made to fear for the continuity of their Internet service from Swarthmore.

65. As a result of these disruptions, and in order to assure that their Internet services are not disconnected – in which case SCDC members would lose a critical avenue of expression – Pavlosky and Smith have been forced to limit their and other SCDC members' expression, in ways that are contrary to the SCDC mission to support free and open exchange of information.

## COUNT II: MISUSE OF COPYRIGHT
(All Parties)

66. Plaintiffs repeat and incorporate herein by reference the allegations in the preceding paragraphs of this complaint.

67. The publication of the e-mail archive is fair use, not infringement. Plaintiffs are informed and believe and based upon information and belief allege that the facts that underlie this conclusion include, but are not limited to:

    a. The purpose and character of the use is to inform public discussion and political debate on a matter core to American democracy, the functioning of our electoral system;

    b. The nature of the work is factual;

    c. The archive does not embody any substantial expressive work and is necessary in the aggregate for purposes of commentary and criticism;

    d. The publication of the e-mail archive does not compete with Diebold in any current

|   |   |
|---|---|
| 1 | or potential market.  If the publication cuts into sales of Diebold's e-voting |
| 2 | equipment it does so only because Diebold's own statements have raised concerns |
| 3 | about the security of their electronic voting machines. |

68. Plaintiffs are informed and believe and based upon such information and belief allege that Diebold's motivation in demanding the documents' removal was not to protect any market for distribution of its e-mail archive or other interest protected by copyright law, but instead to stifle free speech in the form of criticisms of its electronic voting systems.

69. Plaintiffs are informed and believe and based upon such information and belief allege that Diebold used copyright claims in its cease-and-desist demands because the "safe harbor" provisions of the Digital Millennium Copyright Act, 17 U.S.C. § 512, provided a mechanism by which it could demand expeditious takedown of materials alleged to infringe copyright.

70. Plaintiffs are informed and believe and based upon such information and belief allege that Diebold did not intend in good faith to follow up on its threats of litigation, because it knew or should have know that linking to or publication of the documents constitutes a fair use of copyrighted material protected under 17 U.S.C. § 107, *et seq.*

71. Defendants engaged in the misuse of their copyrights, including in the letters of October 9, 10, and 21, 2003, by claiming that the publication of the e-mail archive by Swarthmore College students constituted copyright infringement when they knew that it did not.

72. Defendants engaged in the misuse of their copyrights, including in the letters of October 10 and 21, 2003, by claiming that OPG could be liable for copyright infringement for hosting a website that merely linked to the e-mail archive.

73. Defendants engaged in the misuse of their copyrights, including in the letter of October 21, 2003, by claiming that Hurricane Electric could be liable for copyright infringement for providing upstream hosting services to an ISP that itself hosted a website that merely linked to the e-mail archive.

## COUNT III: 17 U.S.C. 512(f) MISREPRESENTATION
(All Parties)

74. Plaintiffs repeat and incorporate herein by reference the allegations in the preceding paragraphs of this complaint.

75. Plaintiffs are informed and believe and based upon such information and belief allege that Diebold knew that the publication of the e-mail archive and of links to the e-mail archive were not an infringement of copyright.

### Online Policy Group

76. In its cease-and-desist letters of October 10 and 21, 2003, purportedly issued under the authority of 17 U.S.C. § 512, Diebold knowingly materially misrepresented that publication of and links to the e-mail archive to be infringing.

77. In its cease-and-desist letters of October 10 and 21, 2003, purportedly issued under the authority of 17 U.S.C. § 512, Diebold knowingly materially misrepresented that OPG could be liable under copyright law for hosting a website that merely contained a link to the e-mail archive that it claimed was infringing.

78. In its letter of October 21, 2003, purportedly issued under the authority of 17 U.S.C. § 512, Diebold knowingly materially misrepresented that Hurricane Electric could be liable under copyright law for providing upstream services to an ISP whose users had a website that merely contained a link to the e-mail archive that Diebold claimed was infringing.

79. OPG has been injured by the misrepresentation in that Hurricane Electric, its service provider, relied upon the misrepresentation to forbid OPG from allowing its clients to post copies of the e-mail archive.

### Pavlosky and Smith

80. In its letter of October 9, 2003, issued under the authority of 17 U.S.C. §512, Diebold knowingly materially misrepresented that publication of a portion of the e-mail archive was infringing.

81. Plaintiffs Pavlosky and Smith have been injured by the misrepresentation in that Swarthmore College, their service provider, relied upon the misrepresentation to terminate their

hosting of the e-mail archive and to forbid them from linking to the e-mail archive.

## COUNT IV: DECLARATORY RELIEF
(All Parties)

82. Plaintiffs repeat and incorporate herein by reference the allegations in the preceding paragraphs of this complaint.

83. There is a real and actual controversy between Plaintiffs and Defendants regarding whether the publication of or linking to the e-mail archive constitutes copyright infringement.

84. There is a real and actual controversy between Plaintiffs and Defendants regarding whether an Internet Service Provider can be held liable for hosting a website that links to allegedly infringing material.

85. There is a real and actual controversy between Plaintiffs and Defendants regarding whether an upstream Internet Service Provider can be held liable for providing services to another Internet Service Provider who hosts a website that links to allegedly infringing material.

86. Plaintiffs seek a declaratory judgment pursuant to 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57 for the purpose of determining and adjudicating questions of actual controversy between the parties.

87. Plaintiffs contend as it relates to the Defendants and the e-mail archive that, consistent with the Copyright Act of the United States of America, including those laws prohibiting direct, contributory or vicarious infringement, laws protecting fair use and the First Amendment to the United States Constitution, and judicial decisions construing such laws, doctrines, and provisions:

    a) Publication of the e-mail archive is lawful;

    b) Hosting or providing colocation services to websites that link to allegedly infringing material is lawful;

    c) Providing Internet services to others who host websites that link to allegedly infringing material is lawful.

88. Plaintiffs are informed, believe and thereon allege that the Defendants contend the contrary of each of above-stated propositions (a) through (c).

89. Wherefore, Plaintiffs request that the court determine and adjudge that each and every of the above-stated propositions states the law applicable to the facts involved in this action.

### PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs pray for judgment for themselves and all others similarly situated as follows:

1. A declaratory judgment that that as it relates to the Defendants and the e-mail archive that:

    a) Publication of the e-mail archive is lawful;

    b) Hosting or providing colocation services to websites that link to allegedly infringing material is lawful;

    c) Providing Internet services to others who host websites that link to allegedly infringing material is lawful.

2. Injunctive relief restraining the Defendants, their agents, servants, employees, successors and assigns, and all others in concert and privity with them, from bringing any lawsuit or threat against Plaintiffs or any other person or entity for copyright infringement of the e-mail archive in connection with the publication, linking to or hosting services described above.

3. Damages for copyright misuse and intentional interference with contractual relations according to proof;

4. Judgment barring Defendants from enforcing any copyright in the e-mail archive unless and until their misuse has ceased;

5. Attorneys fees pursuant to 17 U.S.C. § 512(f), other portions of the Copyright Act, on a Private Attorney General basis, or otherwise as allowed by law;

6. Plaintiffs' costs and disbursements within; and

7. Such other and further relief as the Court shall find just and proper.

///

///

///

Plaintiffs hereby request a jury trial for all issues triable by jury including, but not limited to, those issues and claims set forth in any amended complaint or consolidated action.

DATED: November 14, 2003

By _____
Cindy A. Cohn, Esq. (SBN.145997)
Wendy Seltzer, Esq.
ELECTRONIC FRONTIER FOUNDATION
454 Shotwell Street
San Francisco, CA 94110
Telephone:   (415) 436-9333 x108
Facsimile:    (415) 436-9993

Attorneys for Plaintiffs