DESIGNATED FOR PUBLICATION

# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| ONLINE POLICY GROUP, NELSON CHU PAVLOSKY, and LUKE THOMAS SMITH,<br><br>Plaintiffs,<br><br>v.<br><br>DIEBOLD, INCORPORATED, and DIEBOLD ELECTION SYSTEMS, INCORPORATED,<br><br>Defendants. | Case Number C 03-04913 JF<br><br>**ORDER GRANTING IN PART AND DENYING IN PART CROSS-MOTIONS FOR SUMMARY JUDGMENT**<br><br>[Docket Nos. 51 & 57] |

    The parties have filed cross-motions for summary judgment seeking a determination as to what constitutes proper use of the internet service provider safe harbor provisions of the Digital Millennium Copyright Act. The Court has read the briefing submitted by the parties and has considered the oral arguments of counsel. For the reasons set forth below, both motions will be granted in part and denied in part.

Case No. C 03-04913 JF
ORDER GRANTING IN PART AND DENYING IN PART CROSS-MOTIONS FOR SUMMARY JUDGMENT
(JFLC1)

# I. BACKGROUND

Defendants Diebold, Inc. and Diebold Election Systems, Inc. (collectively "Diebold") produce electronic voting machines. The machines have been the subject of critical commentary.[1] Both the reliability and verification procedures of the machines have been called into question, in part because not all of the machines provide a means for verifying whether a voter's choice has been recorded correctly. It is undisputed that internal emails exchanged among Diebold employees (the "email archive") contain evidence that some employees have acknowledged problems associated with the machines. *See* Plaintiffs' Motion for Summary Judgment, pp. 3–4. According to Diebold, the email archive also contains discussion of "the development of Diebold's proprietary computerized election systems, as well as Diebold trade secret information, and even employees' personal information such as home addresses and cell phone numbers." Defendants' Motion for Summary Judgment, p. 9. At some point early in 2003, the entire email archive was obtained and reproduced on the internet by unknown persons, giving rise to the events pertinent to the present motions.

Plaintiffs Nelson Chu Pavlosky ("Pavlosky") and Luke Thomas Smith ("Smith") are students at Swarthmore College ("Swarthmore"). Using internet access provided by Swarthmore, which for present purposes is considered their internet service provider ("ISP"), Pavlosky and Smith posted the email archive on various websites. *See* Declaration of Nelson Chu Pavlosky in Support of Plaintiff's [sic] Application for Temporary Restraining Order and for

---

[1] *See, e.g.*, "Voting Machines: Good Intentions, Bad Technology," THE ECONOMIST, Jan. 24, 2004, pp. 30–31; "Securing Electronic Voting: California Takes Steps to Safeguard System," SAN JOSE MERCURY NEWS, Feb. 6, 2004; Tom Zeller, Jr., "Ready or Not, Electronic Voting Goes National," NEW YORK TIMES, Sep. 19, 2004, http://www.nytimes.com/2004/09/19/politics/campaign/19vote.html?ex=1096611569&ei=1&en=c490a5e466b682e3. *See also American Ass'n of People with Disabilities v. Shelley*, 324 F.Supp.2d 1120, 1128 (C.D. Cal. 2004) (upholding the decision of the Secretary of State of California to decertify and withdraw approval of some Diebold electronic voting machines on the ground that the machines were not yet "stable, reliable and secure enough to use in the absence of an accessible; voter-verified, paper audit trail"); Stuart Pfeifer, "State Joins Suit over Voting Machines," LOS ANGELES TIMES, Sept. 8, 2004, http://www.latimes.com/news/local/la-me-machines8sep08,1,384118.story.

Preliminary Injunction ("Pavlosky PI Decl."), ¶ 5. An on-line newspaper, IndyMedia, published an article criticizing Diebold's electronic voting machines and containing a hyperlink to the email archive. *See* Plaintiffs' Motion for Summary Judgment, p. 5. Plaintiff Online Policy Group ("OPG") provides IndyMedia's internet access.[2] OPG, in turn, obtains internet access from an upstream ISP, Hurricane Electric ("Hurricane").

In response to the activities of Pavlosky, Smith, and IndyMedia, and in an alleged effort to prevent further public viewing of the email archive, Diebold sent cease and desist letters to many ISPs, including Swarthmore, OPG, and Hurricane, pursuant to the safe harbor provisions of the Digital Millennium Copyright Act ("DMCA").[3] Swarthmore, OPG, and Hurricane were advised that pursuant to these provisions they would be shielded from a copyright infringement suit by Diebold if they disabled access to or removed the allegedly infringing material. Swarthmore thereafter required Pavlosky and Smith to remove the email archive from their website. At the same time, Hurricane notified OPG that it might be required to terminate OPG's internet access if IndyMedia's hyperlink to the email archive was not removed. Hurricane agreed, however, not to act during the pendency of the present action, and consequently OPG did not disable access to or remove any material.

---

[2] OPG asserts that the "IndyMedia website resides on a webserver co-located with OPG. 'Colocation' means that the San Francisco IndyMedia server is not owned or controlled by OPG; it simply resides in physical premises leased from OPG alongside OPG's own servers and utilizes OPG's Internet connection." Complaint, p. 3:24–27. OPG further asserts that, because it did not control the IndyMedia server, "instead only providing Internet connectivity to that computer through colocation, OPG could not comply by merely disabling or removing the hyperlink and related information demanded by Diebold. OPG's only option to comply with the demand was to cut off IndyMedia's Internet connectivity entirely." *Id*. at 5:1–5. OPG also asserts the same reasoning with respect to its relationship with Hurricane. *Id*. at 5:25–28. The parties do not dispute that OPG and Hurricane could have utilized the DMCA's safe harbors had they disabled IndyMedia's and OPG's internet connectivity, respectively. Accordingly, for the purposes of the present litigation, the Court will assume without deciding that OPG is IndyMedia's ISP and Hurricane is OPG's ISP. The technical distinction does serve to illustrate the ramifications for free speech of Diebold's demands.

[3] PUB. L. NO. 105-304, 112 Stat. 2860 (1998); 17 U.S.C. § 512; Section 202 of the DMCA.

1    Diebold has not filed any lawsuits related to publication of the email archive.  Plaintiffs
2 Smith, Pavlosky, and OPG nonetheless seek injunctive, declaratory, and monetary relief from
3 this Court, alleging that Diebold's claim of copyright infringement was based on knowing
4 material misrepresentation and that Diebold interfered with Plaintiffs' contractual relations with
5 their respective ISPs.[4]  Plaintiffs seek a judicial declaration that publication of the email archive,
6 hosting or providing colocation services to websites that link to allegedly infringing material, and
7 providing internet services to others who host websites that link to allegedly infringing material
8 are lawful activities.  They request an injunction to prevent Defendants from threatening or
9 bringing any lawsuit for copyright infringement with respect to the email archive arising from the
10 publication, linking, or hosting services described in the complaint and a judgment barring
11 Defendants from enforcing any copyright in the email archive unless and until Defendants'
12 alleged copyright misuse has ceased.  They also seek $5,185.50 in damages[5] and attorneys' fees
13 pursuant to 17 U.S.C. § 512(f) for Diebold's alleged misrepresentation or as otherwise allowed
14 by law, as well as costs and disbursements.

## II.  APPLICABLE LAW

**A.    Summary Judgment**

A motion for summary judgment should be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c)); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  Material facts are those that may affect the outcome of the case.  *Anderson*, 477 U.S. at 248.  There is a genuine dispute if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.

---

[4] The complaint also includes a claim for alleged copyright misuse.  Diebold argues that copyright misuse may be asserted solely an affirmative defense to a claim of copyright infringement.  Plaintiffs cite no legal authority, and the Court is aware of none, that allows an affirmative claim for damages for copyright misuse.  Plaintiffs appear to have withdrawn this cause of action.  *See* Transcript of Law & Motion Hearing, February 9, 2004, p. 7:2–5.

[5] *See* Plaintiffs' Motion for Summary Judgment, p. 25.

Case No. C 03-04913 JF
ORDER GRANTING IN PART AND DENYING IN PART CROSS-MOTIONS FOR SUMMARY JUDGMENT
(JFLC1)

*Id*. Summary judgment thus is not appropriate if the nonmoving party presents evidence from which a reasonable jury could resolve the material issue in his or her favor. *Barlow v. Ground*, 943 F.2d 1132, 1136 (9th Cir. 1991). However, the more implausible the claim or defense asserted by the nonmoving party, the more persuasive its evidence must be to avoid summary judgment. *Jackson v. Bank of Hawaii*, 902 F.2d 1385, 1389 (9th Cir. 1990).

The moving party bears the initial burden of informing the Court of the basis for the motion, and identifying portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of a triable issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets its initial burden, the burden shifts to the nonmoving party to present specific facts showing that there is a genuine issue of material fact for trial. FED. R. CIV. P. 56(e); *Celotex Corp.*, 477 U.S. at 324. The evidence and all reasonable inferences therefrom must be viewed in the light most favorable to the nonmoving party. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630–31 (9th Cir. 1987).

**B.  Copyright Law**

Copyright laws are enacted pursuant to Article 1, Section 8 of the Constitution, which provides that "[t]he Congress shall have Power . . . to Promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." The elements of a copyright infringement claim are: (1) ownership of a valid copyright and (2) copying[6] of expression protected by that copyright. *See* 17 U.S.C. § 106(1); *Triad Sys. Corp. v. Southeastern Express Co.*, 64 F.3d 1330, 1335 (9th Cir. 1995). To be liable for direct infringement, one must "actively engage in" and "directly cause" the copying. *See Religious Tech. Ctr. v. Netcom On-Line Communication Servs., Inc.*, 907 F.Supp. 1361 (N.D. Cal. 1995).

---

[6] Distribution, preparation of derivative works, performance, and public display also may constitute copyright infringement. *See* 17 U.S.C. § 106. The modes of infringement listed in 17 U.S.C. § 106 may "overlap" in the cyberspace context. *See* Mark A. Lemley, *Dealing with Overlapping Copyrights on the Internet*, 22 U. DAYTON L. REV. 547 (1997).

There is no statutory rule of liability for contributory infringement. However, courts recognize such liability when the defendant "with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another." *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2nd Cir. 1971). "Such participation must be substantial." *Religious Tech. Ctr.*, 907 F.Supp. at 1361. The party alleging contributory infringement must show "(1) direct infringement by a primary infringer, (2) knowledge of the infringement, and (3) material contribution to the infringement." *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster Ltd.*, 380 F.3d 1154, 1160 (9th Cir. 2004). A defendant may be liable under a vicarious liability theory if the plaintiff demonstrates "(1) direct infringement by a primary party, (2) a direct financial benefit to the defendant, and the right and ability to supervise the infringers." *Id*. at 1164.

Copyright protection sometimes appears to conflict with First Amendment protections. This conflict is ameliorated in part by various copyright doctrines. For example, consistent with the "idea-expression" dichotomy, expression, but not an idea, is copyrightable. *See* 17 U.S.C. § 102(b); *Eldred v. Ashcroft*, 537 U.S. 186, 219 (2003); *Baker v. Seldin*, 101 U.S. 99 (1879). Similarly, copyright law protects only creative works, not facts. *See, e.g.*, *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 349 (1991). Finally, fair use is not infringement of a copyright. *See* 17 U.S.C. § 107; *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994); *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539 (1985). Section 107 provides:

> Notwithstanding the provisions of sections 106 and 106A, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include--
>
> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
> (2) the nature of the copyrighted work;
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
> (4) the effect of the use upon the potential market for or value of the copyrighted

work.

The Supreme Court has clarified that copyright laws should be designed to promote creativity by protecting only creative work and, then, only for a limited time. A

> limited grant is a means by which an important public purpose may be achieved. It is intended to motivate the creative activity of authors and inventors by the provision of a special reward, and to allow the public access to the products of their genius after the limited period of exclusive control has expired.

*Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 429 (1984); *see also Eldred*, 537 U.S. 186.

**C.     Internet Service Provider Safe Harbor Provisions**

Section 202 of the DMCA contains various nonexclusive[7] safe harbors designed to limit the liability of ISPs[8] for incidental acts of copyright infringement. It provides immunity to ISPs that satisfy the conditions of eligibility, s*ee* 17 U.S.C. § 512(i),[9] "from copyright infringement liability for 'passive,' 'automatic' actions in which [an ISP's] system engages through a technological process initiated by another without the knowledge of the" ISP. *ALS Scan, Inc. v. RemarQ Communities, Inc.*, 239 F.3d 619, 625 (4th Cir. 2001). Once the ISP has actual knowledge of the infringing material, it loses the safe harbor protections unless it complies with

---

[7] Nothing in the DMCA suggests that Congress intended this statute to constitute the exclusive legal basis for protecting a copyright or defending against allegations of infringement. In fact, 17 U.S.C. § 512(l) provides that "failure to . . . qualify for limitation of liability under this section shall not bear adversely upon the consideration of . . . any other defense."

[8] The DMCA provides two definitions of "service provider." The first, which applies to section 512(a), is "an entity offering the transmission, routing, or providing connections for digital online communications, between or among points specified by a user, of material of the user's choosing, without modification to the content of the material as sent or received." 17 U.S.C. § 512(k)(1)(A). The second, which applies to the rest of section 512, is "a provider of online services or network access, or the operator of facilities therefor, and includes an entity described in [17 U.S.C. § 512(k)(1)(A)]." 17 U.S.C. § 512(k)(1)(B). "Service provider" thus is defined more narrowly with respect to the "conduit" safe harbor provision.

[9] The parties do not dispute that Hurricane, OPG, and Swarthmore had valid section 512(i) policies. *See, e.g.*, Complaint, p. 5:20–23 & Ex. D (email from Ralph E. Jocke), although there is no evidence in the record as to this point with respect to OPG and Swarthmore. The Court will assume without deciding that all parties had valid section 512(i) policies.

the DMCA.

17 U.S.C. § 512(a)—the "conduit" safe harbor—does not require notice and takedown of any content. Instead, an ISP is not liable for "transmitting, routing, or providing connections, for material through a system or network controlled or operated by or for the service provider" if the ISP did not (1) initiate the transmission, (2) select the material in a nonautomatic way, (3) select the recipients in a nonautomatic way, (4) retain a copy for longer than necessary to transmit it, and (5) modify the material. 17 U.S.C. § 512(a). In contrast, section 512(c)—the "storage" safe harbor—does require notice and takedown of allegedly infringing material. This provision

> gives Internet service providers a safe harbor from liability for infringement of copyright by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider as long as the service provider can show that: (1) it has neither actual knowledge that its system contains infringing materials nor an awareness of facts or circumstances from which infringement is apparent, or it has expeditiously removed or disabled access to infringing material upon obtaining actual knowledge of infringement; (2) it receives no financial benefit directly attributable to infringing activity; *and* (3) it responded expeditiously to remove or disable access to material claimed to be infringing after receiving from the copyright holder a notification conforming with requirements of § 512(c)(3).

*ALS Scan, Inc.*, 239 F.3d at 623 (internal citation omitted). 17 U.S.C. § 512(d) provides a similar safe harbor from liability for copyright infringement resulting from use of "information location tools," which include "hypertext links" ("hyperlinks"). Section 512(g) provides for replacement of the removed material upon counter-notice by the alleged infringer. Upon counter-notice of noninfringement by an ISP subscriber, the ISP may reestablish access to the content without fear of liability. Such replacement generally must be performed within approximately fourteen days. *See* 17 U.S.C. § 512(g)(2)(C).[10]

17 U.S.C. § 512(f) provides as follows:

Misrepresentations.--Any person who knowingly materially misrepresents under

---

[10] Although section 512(g) refers to section 512(c), it does not refer expressly to section 512(d). Courts nonetheless have held that the replacement procedure of section 512(g) applies to takedown pursuant to section 512(d). *See, e.g., Perfect10, Inc. v. Cybernet Ventures, Inc.*, 213 F.Supp.2d 1146, 1179 (C.D. Cal. 2002).

> this section--
> (1) that material or activity is infringing, or
> (2) that material or activity was removed or disabled by mistake or misidentification,
>
> shall be liable for any damages, including costs and attorneys' fees, incurred by the alleged infringer, by any copyright owner or copyright owner's authorized licensee, or by a service provider, who is injured by such misrepresentation, as the result of the service provider relying upon such misrepresentation in removing or disabling access to the material or activity claimed to be infringing, or in replacing the removed material or ceasing to disable access to it.

Thus, any person who sends a cease and desist letter with knowledge that claims of infringement are false may be liable for damages.

### III. DISCUSSION

**A.   Mootness**

Diebold has represented to the Court that it has withdrawn and in the future will not send a cease and desist letter pursuant to the DMCA to any ISP concerning the email archive. *See* Response to Plaintiffs' Post-Hearing Letter and Supplemental Ng Declaration, dated November 24, 2003, p. 1; Transcript of Law & Motion Hearing, February 9, 2004, pp. 3:24–4:3. Because no actual controversy remains[11] with respect to prevention of publication of the email archive, *see* 28 U.S.C. § 2201; *Aetna Life Ins. Co. of Hartford, Conn. v. Haworth*, 300 U.S. 227 (1937), Plaintiffs' claims for an injunction and declaratory relief are moot.[12]  However, Plaintiffs' claims

---

[11] Plaintiffs appear to have conceded at oral argument that their claims for injunctive and declaratory relief are moot and that a decision on their claims for damages will be a sufficient adjudication of their rights. *See* Transcript of Law & Motion Hearing, February 9, 2004, pp. 5:21–23, 6:22–24, 7:6–12, 10:4–9.

[12] The Court also notes that in view of *Grokster*, a general declaration that hyperlinking to infringing material does not amount to contributory infringement or subject one to vicarious liability would be improper.  Although hyperlinking per se does not constitute direct copyright infringement because there is no copying, *see, e.g.*, *Ticketmaster Corp. v. Tickets.com, Inc.*, 2000 WL 525390 (C.D. Cal., March 27, 2000), in some instances there may be a tenable claim of contributory infringement or vicarious liability. *See, e.g.*, *Grokster*, 2004 WL 1853717 at *3 (9th Cir., Aug. 19, 2004) at *6 (If an alleged contributory infringer is a "true access provider[], failure to disable . . . access after acquiring specific knowledge of a user's infringement might be material contribution."); *Religious Tech. Ctr.*, 907 F.Supp. at 1361; *A&M Records, Inc. v.*

for damages, attorneys' fees, and costs relating to Diebold's past use of the DMCA's safe harbor provisions still require adjudication.

**B.     Misrepresentation of Copyright Infringement:  17 U.S.C. § 512(f)**

**1.     Publication of some of the contents in the email archive is lawful.**

At the hearing on Plaintiffs' motion for preliminary injunction, Diebold's counsel asserted that portions of the email archive contain material that is copyrighted and has no "public interest" value.  Transcript of Law and Motion Hearing, November 17, 2003, p. 8:7–12.  However, Diebold did not identify and has never identified specific emails that contain copyrighted content, and thus it has not provided evidence to support its counsel's assertion.  *See, e.g.*, *id*. at 10.  At the same time, Diebold appears to have acknowledged that at least some of the emails are subject to the fair use doctrine.  *See, e.g.*, *id*. at 12:8–9 & 14–16.

The purpose, character, nature of the use, and the effect of the use upon the potential market for or value of the copyrighted work all indicate that at least part of the email archive is not protected by copyright law.  The email archive was posted or hyperlinked to for the purpose of informing the public about the problems associated with Diebold's electronic voting machines.  It is hard to imagine a subject the discussion of which could be more in the public interest.  If Diebold's machines in fact do tabulate voters' preferences incorrectly, the very legitimacy of elections would be suspect.  Moreover, Diebold has identified no specific commercial purpose or interest affected by publication of the email archive, and there is no evidence that such publication actually had or may have any affect on the putative market value, if any, of Diebold's allegedly copyrighted material.  Even if it is true that portions of the email archive have commercial value, there is no evidence that Plaintiffs have attempted or intended to sell copies of the email archive for profit.  Publishing or hyperlinking to the email archive did not prevent Diebold from making a profit from the content of the archive because there is no

---

*Napster, Inc.*, 139 F.3d 1004, 1021–22 (9th Cir. 2001).  In this context, it is notable that the DMCA provides ISPs a safe harbor (17 U.S.C. § 512(d)) from liability for copyright infringement resulting from "information location tools."

Case No. C 03-04913 JF
ORDER GRANTING IN PART AND DENYING IN PART CROSS-MOTIONS FOR SUMMARY JUDGMENT (JFLC1)
10

evidence that Diebold itself intended to or could profit from such content.  At most, Plaintiffs' activity might have reduced Diebold's profits because it helped inform potential customers of problems with the machines.  However, copyright law is not designed to prevent such an outcome.  *See, e.g.*, *Acuff-Rose*, 510 U.S. at 591–92.  Rather, the goal of copyright law is to protect creative works in order to promote their creation.  To the extent that Diebold argues that publication of the entire email archive diminished the value of some of its proprietary software or systems information, it must be noted that there is no evidence that *Plaintiffs* published or linked to the archive in order to profit.[13]  Finally, Plaintiffs' and IndyMedia's use was transformative: they used the email archive to support criticism that is in the public interest, not to develop electronic voting technology.  Accordingly, there is no genuine issue of material fact that Diebold, through its use of the DMCA, sought to and did in fact suppress publication of content that is not subject to copyright protection.[14]

### 2.  Diebold violated section 512(f).

Plaintiffs argue that Diebold "knowingly materially misrepresented" that publication of the email archive constituted copyright infringement and thus is liable for damages pursuant to 17 U.S.C. § 512(f).  The parties dispute the meaning of the phrase "knowingly materially misrepresents."  Plaintiffs argue that a type of preliminary injunction standard should be applied.  That is, the Court should conclude that Diebold violated section 512(f) if it did not have a

---

[13] The fact that Diebold had not published the email archive is not dispositive.  The "first publication right" permits the creator to control the final expression of the published work.  There is no such interest here, in the context of an archive of fact-based or proprietary emails.  Because Diebold clearly has indicated that it never intended to publish the emails, the fact that the email archive was unpublished does not obviate application of the fair use doctrine.

[14] Even if Diebold is correct that some individual emails may contain only proprietary software code or information concerning Diebold's voting systems and thus is subject to copyright protection, there nonetheless is no genuine issue of material fact that publication of some of the email archive does not amount to copyright infringement.  Plaintiffs additionally have argued that they were required to post the entire email archive because Diebold has accused Plaintiffs and others of taking individual emails out of context.  *See* Plaintiffs' Motion for Summary Judgment, p. 12.  Significantly, Diebold does not identify which of the more than thirteen thousand emails support its argument.

Case No. C 03-04913 JF
ORDER GRANTING IN PART AND DENYING IN PART CROSS-MOTIONS FOR SUMMARY JUDGMENT
(JFLC1)

"likelihood of success" on the merits of a copyright infringement claim when it sent the DMCA letters. Diebold contends that the Court should apply a type of Federal Rule of Civil Procedure 11 ("Rule 11") standard and thus conclude that Diebold did not violate section 512(f) unless sending the DMCA letters was "frivolous." Because the DMCA is of relatively recent vintage, the issue appears to be one of first impression.

The Court concludes that neither standard is appropriate. A requirement that a party have an objectively measured "likelihood of success on the merits" in order to assert claims of copyright infringement would impermissibly chill the rights of copyright owners. At the same time, in requiring a showing of "knowing material misrepresentation," Congress explicitly adopted a standard different from that embodied in Rule 11, which contains a variety of other requirements that are not necessarily coextensive with those set forth in section 12(f). The Court concludes that the statutory language is sufficiently clear on its face and does not require importation of standards from other legal contexts. A party is liable if it "knowingly" and "materially" misrepresents that copyright infringement has occurred. "Knowingly" means that a party actually knew, should have known if it acted with reasonable care or diligence, or would have had no substantial doubt had it been acting in good faith, that it was making misrepresentations. *See* BLACK'S LAW DICTIONARY (8th ed. 2004) (definitions of "knowledge," in particular, "actual" and "constructive" knowledge). "Material" means that the misrepresentation affected the ISP's response to a DMCA letter. *See id.*

Applying this standard and in light of the evidence in the record, the Court concludes as a matter of law that Diebold knowingly materially misrepresented that Plaintiffs infringed Diebold's copyright interest, at least with respect to the portions of the email archive clearly subject to the fair use exception. No reasonable copyright holder could have believed that the portions of the email archive discussing possible technical problems with Diebold's voting machines were protected by copyright, and there is no genuine issue of fact that Diebold

knew—and indeed that it specifically intended[15]—that its letters to OPG and Swarthmore would result in prevention of publication of that content. The misrepresentations were material in that they resulted in removal of the content from websites and the initiation of the present lawsuit. The fact that Diebold never actually brought suit against any alleged infringer suggests strongly that Diebold sought to use the DMCA's safe harbor provisions—which were designed to protect ISPs, not copyright holders—as a sword to suppress publication of embarrassing content rather than as a shield to protect its intellectual property.

### C.  Tortious Interference with Contractual Relations

Plaintiffs also claim that, through its inappropriate use of the DMCA, Diebold interfered with their contractual relations with their respective ISPs. Under California law, the elements of intentional interference with contractual relations are: (1) a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of this contract; (3) intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the relationship; and (5) resulting damage. *See Quelimane Co. v. Stewart Title Guar. Co.*, 19 Cal.4th 26 (1998). As an affirmative defense to a charge of tortious interference with contract, a defendant may show that its actions were justified. *See A.F. Arnold & Co. v. Pacific Prof'l Ins., Inc.*, 104 Cal.Rptr. 96, 99 (1972).

> One who, by asserting in good faith a legally protected interest of his own or threatening in good faith to protect the interest by appropriate means, intentionally causes a third person not to perform an existing contract or enter into a prospective contractual relation with another does not interfere improperly with the other's relation if the actor believes that his interest may otherwise be impaired or destroyed by the performance of the contract or transaction.

Restatement (Second) of Torts § 773.

> The test of whether there is justification for conduct which induces a breach of contract turns on a balancing of the social and private importance of the objective advanced by the interference against the importance of the interest interfered with, considering all the circumstances including the nature of the actor's

---

[15] Indeed, Diebold's counsel stated that "the DMCA provides the rapid response, the rapid remedies that Congress had in mind." Law & Motion Hearing, November 17, 2003, p. 30:6–8.

conduct and the relationship between the parties.

*Richardson v. La Racherita of La Jolla*, 98 Cal.App.3d 73, 81 (1979).

Diebold argues that Plaintiffs cannot prevail on their interference with contract claim because: (1) Pavlosky and Smith have not shown that they had a contract with Swarthmore; (2) Swarthmore's compliance with the DMCA does not constitute breach of contract; (3) OPG has not demonstrated that there has been any breach or disruption of its contract with Hurricane; (4) Hurricane's contract with OPG permits it to comply with the DMCA; (5) seeking to protect one's copyright does not constitute interference with a contract; and (6) the state law is preempted if it is applied in such a manner as to prevent a party from complying with the DMCA.

The Court agrees with Diebold that on the facts of this case the claim is preempted. Preemption occurs "when compliance with both state and federal [laws] is a physical impossibility or when state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hillsborough County Fla. v. Automated Med. Labs. Inc.*, 471 U.S. 707, 713 (1985) (internal citations omitted); *see also In re Cybernetics Servs., Inc.*, 252 F.3d 1039, 1045 (9th Cir. 2001) (internal citation omitted).

Even if a copyright holder does not intend to cause anything other than the removal of allegedly infringing material, compliance with the DMCA's procedures nonetheless may result in disruption of a contractual relationship: by sending a letter, the copyright holder can effectuate the disruption of ISP service to clients. If adherence to the DMCA's provisions simultaneously subjects the copyright holder to state tort law liability, there is an irreconcilable conflict between state and federal law. To the extent that Plaintiffs argue that there is no conflict because Diebold's use of the DMCA in this case was based on misrepresentation of Diebold's rights, their argument is undercut by the provisions of the statute itself. In section 512(f), Congress provides an express remedy for misuse of the DMCA's safe harbor provisions. It appears that Congress carefully balanced the competing interests of copyright holders, ISPs, and the public, by providing immunity subject to relief for any misuse of the statute. Accordingly, Diebold's motion will be granted as to Plaintiffs' state law claim.

Case No. C 03-04913 JF
ORDER GRANTING IN PART AND DENYING IN PART CROSS-MOTIONS FOR SUMMARY JUDGMENT
(JFLC1)

14

## IV. ORDER

Good cause therefore appearing, IT IS HEREBY ORDERED that:

(1) Plaintiffs' causes of action for injunctive and declaratory relief and for copyright misuse are deemed moot;

(2) Plaintiffs' motion is GRANTED with respect to their claim pursuant to 17 U.S.C. § 512(f) and otherwise is DENIED;

(3) Diebold's motion is GRANTED as to Plaintiffs' state law claim for tortious interference with contractual relations and otherwise is DENIED; and

(4) Within ten (10) days of the date that this Order is filed, Plaintiffs shall submit a brief addressing the monetary relief, including attorneys' fees and costs, to which they belief they are entitled pursuant to 17 U.S.C. § 512(f) .  Diebold may file an opposition brief within ten (10) days after service of Plaintiffs' brief.  Plaintiffs may file a reply brief within five (5) days after service of Diebold's opposition brief.  The matter thereafter shall stand submitted.

DATED: September 30, 2004

/s/ (electronic signature authorized)
JEREMY FOGEL
United States District Judge

Case No. C 03-04913 JF
ORDER GRANTING IN PART AND DENYING IN PART CROSS-MOTIONS FOR SUMMARY JUDGMENT
(JFLC1)

1  Copies of Order have been served upon the following persons:

2  Cindy Ann Cohn
   cindy@eff.org
3  wendy@eff.org
   barak@eff.org
4
   Jennifer Stisa Granick
5  jennifer@law.stanford.edu

6  Tharan Gregory Lanier
   tglanier@jonesday.com
7  snakanomcswain@jonesday.com

8  Robert A. Mittelstaedt
   ramittelstaedt@jonesday.com
9  mpvandall@jonesday.com
   ybennett@jonesday.com
10 arsand@jonesday.com
   tllovitt@jonesday.com
11 cevaudreuill@jonesday.com
   aius@jonesday.com
12
   Adam Richard Sand
13 arsand@jonesday.com
   mlandsborough@jonesday.com
14 cyip@jonesday.com

15 Matthew P. Vandall
   mvandall@jonesday.com
16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. C 03-04913 JF
ORDER GRANTING IN PART AND DENYING IN PART CROSS-MOTIONS FOR SUMMARY JUDGMENT
(JFLC1)